IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| VELVA J. HERIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:06-CV-419 |
| | ) |
| THE PRUDENTIAL INSURANCE | ) |
| COMPANY OF AMERICA and | ) |
| MASTERCRAFT BOAT COMPANY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This civil action is brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for the recovery of long term disability benefits ("LTD"). The court previously remanded this case for further evaluation. *See Herin v. Prudential Ins. Co. of Am.*, No. 3:06-CV-419, 2008 WL 305004 (E.D. Tenn. Jan. 31, 2008). On remand, following an independent medical examination ("IME"), plaintiff's claim for LTD was again denied.

Now before the court are "Plaintiff's Renewed Motion for Judgment on the Record" [doc. 38], filed by Velva J. Herin ("Herin"), and "Defendants' Renewed Motion for Judgment on the Record" [doc. 36], filed by The Prudential Insurance Company of America ("Prudential") and Mastercraft Boat Company ("Mastercraft'). For the reasons stated herein, defendants' motion will be granted. Herin's motion will be denied and this civil action will

be dismissed.

I.

*Procedural Background*

Prudential issued to Mastercraft an insurance plan (the "Plan") providing LTD benefits. [A.R. 001, 029].[1] Mastercraft is the Plan administrator, and Prudential is the claims administrator. [A.R. 052]. The procedural history of this case was set out in the court's prior memorandum opinion.

> Herin was formerly employed by Mastercraft as a lamenator and was covered by the Plan. [A.R. 059]. She filed a claim for benefits in December 2003, advising that she could not work due to what she termed "seizures" or a "movement disorder." [A.R. 059-63]. After initially denying the claim [A.R. 250], Prudential eventually determined that Herin was entitled to LTD benefits effective August 24, 2003, due to "a possible diagnosis of small fiber neuropathy." [A.R. 259-61].
>
> The Plan establishes two LTD phases:
>
> [Initially], [y]ou are disabled when Prudential determines that:
>
>> you are unable to perform the material and substantial duties of *your regular occupation* due to your sickness or injury; and
>>
>> you have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of *any **gainful occupation*** for

---

[1] References to "A.R." indicate a page or pages of the administrative record. References to "S.R." indicate a page or pages of the supplemental administrative record.

2

> which you are reasonably fitted by education, training or experience.
>
> . . .
>
> We *may* require you to be examined by doctors, other medical practitioners or vocational experts of our choice. Prudential will pay for these examinations. We *can* require examinations *as often as it is reasonable to do so.*

[A.R. 030] (bold in original, italics added).

> By letter dated August 23, 2005, applying the "unable to perform the duties of any gainful occupation" standard, Prudential notified Herin that her LTD benefits would be terminated effective immediately, as the initial twenty-four month period had expired. [A.R. 276]. Herin submitted a request for reconsideration. Prudential again concluded that she does not meet the "unable to perform any reasonable occupation" standard [A.R. 288], following Herin's submission of additional medical records and following a file review by neurologist Susan Pierson. [A.R. 342-45].
>
> Herin then filed a second administrative appeal and again submitted additional medical records. After Dr. Pierson's second file review [A.R. 348-50], Prudential issued its final denial by letter dated June 26, 2006. [A.R. 296]. . . .

*Herin*, 2008 WL 305004, at *1.

On appeal, this court remanded Herin's claim, "strongly suggest[ing]" that Prudential have an IME performed by a qualified physician. *Id.* at 7. At Prudential's request, Dr. Berta Bergia performed an IME on January 14, 2009. By letter dated February 23, 2009, Prudential adopted Dr. Bergia's conclusions in again denying the LTD claim. [S.R. 79]. Prudential again found that Herin does not satisfy the Plan's "any gainful occupation" standard. Prudential also cited a Plan provision [A.R. 37] limiting LTD payments to 24

3

months for disabilities which "are due in whole or in part to mental illness . . . ." Herin now appeals that decision to this court.

## II.

*Standard of Review*

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. However, if a plan grants the administrator or fiduciary the appropriate discretionary authority, this court instead reviews the decision at issue under the "highly deferential arbitrary and capricious standard of review . . . ." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). In its prior memorandum, the court concluded that the arbitrary and capricious standard applies in this case. *See Herin*, 2008 WL 305004, at *2. In her renewed briefing, Herin makes no argument to the contrary. The court will continue to apply the arbitrary and capricious standard in this case.

A "factor" that the court must also consider is the inherent conflict of interest resulting from Prudential's dual roles as decision maker for LTD claims as well as the entity that pays benefits. *See Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991). The court must also take into account the depth of Prudential's consideration of the Social Security Administration's finding of disability. *See Glenn v. MetLife*, 461 F.3d 660, 669 (6th

4

Cir. 2006).

III.

*Administrative Record*

In its January 2008 memorandum opinion, the court summarized the administrative record to date.

> Herin consulted with neurologist John Fang in February 2003 due to complaints of tremors. [A.R. 323]. She reported intermittent "jerking episodes" that began in August 2002, with corresponding episodes of weakness. [A.R. 323-24]. Herin told Dr. Fang that her symptoms began shortly after the anniversary of her father's death, which had "caused her to feel quite depressed." [A.R. 324]. While Dr. Fang observed "slight truncal shaking" in Herin's gait, he otherwise found "no hyperkinetic movement or other abnormal movement evident during today's examination." [A.R. 326]. He also found Herin's short-term memory to be intact. [A.R. 326]. Dr. Fang wrote, "She has also noticed some odd total body jerking which she said that she has had video taped, but unfortunately, the video tape was not available today." [A.R. 324]. Dr. Fang invited Herin to supply him with a copy of the video for his review [A.R. 327], but the record does not indicate that Herin ever produced the tape. Dr. Fang hypothesized that the tremors might be related to an iron deficiency, and that her fatigue could be related to depression. [A.R. 321, 326].
>
> Herin first visited Dr. Choudhury Salekin in May 2003. [A.R. 101].[2] Dr. Salekin diagnosed "solvent induced convulsion/seizure" disorder and lumbar sacral radiculopathy secondary to disc injury. [A.R. 367]. Dr. Salekin also found Herin's short-term memory to be partially impaired. [A.R. 102, 358, 360].
>
> On November 10, 2003, treating physician Jeffrey Robinson noted "some odd type of clonic jerks." [A.R. 301]. At other times, however, Herin has reported improvement. For example, in January 2004, she told Dr.

---

[2] Dr. Salekin's curriculum vitae identifies him as the "Director of Sleep Disorder and Sleep Research Center, Chief Section of Neurology" at the Alvin C. York VA Medical Center in Murfreesboro, Tennessee. [A.R. 370].

Robinson that she only experienced three seizures in 2003. [A.R. 300]. In April and May 2004, Herin's tremor condition was deemed "stable." [A.R. 131, 134]. Dr. Robinson has diagnosed "[s]eizure disorder most likely secondary to solvents at Mastercraft." [A.R. 302, 310]. Admittedly, however, he has "not ha[d] a lot of information about the treatment that her specialists are giving her." [A.R. 302]. Dr. Robinson has alternatively opined that Herin may be suffering from "[p]ossible arsenic poisoning" or "[g]eneralized anxiety disorder." [A.R. 134, 136-37, 301]. In August 2003, Dr. Robinson recommended "that she continues to receive disability compensation in the midst of a complicated medical work-up." [A.R. 468].

In December 2003, Dr. Robinson completed a questionnaire provided by Herin's Social Security attorney. In response to the question, "Have you or any member of your staff ever witnessed this patient during a seizure?", Dr. Robinson answered in the affirmative and provided five dates. [A.R. 192]. There are no medical records in the present file corresponding to three of those dates. Dr. Robinson's notes for the fourth date - February 25, 2003 - make no mention of seizures actually having been observed. In fact, Herin was described that day as being "in no acute distress." [A.R. 303].[3] On the fifth date - November 10, 2003 - Dr. Robinson as noted observed "some odd type of clonic jerks." [A.R. 301].

Physical therapist Baron Johnson performed a functional capacity assessment in May 2004. [A.R. 90-100]. Herin demonstrated minimal to no ability in numerous functional tests. Mr. Johnson concluded,

> Based on the strength classifications as established by the Dictionary of Occupational Titles, Ms. Herin is currently unable to return to work at any capacity. Her maximum lifting capacity is 5.0 pounds. She is not capable of carrying anything at all. According to the DOT-RFC battery, Ms. Herin must be capable of meeting the Demand Minimal Functional Capacity for both lifting and carrying strength categories in order to return to work at any capacity.
>
> . . .

---

[3] However, one day prior, emergency room staff observed Herin to be "shaking all over." [A.R. 332].

6

> Ms. Herin demonstrated intention tremors during her limited functional ability. . . . Ms. Herin's tremors increased in intensity as the physical demands of the FCA increased. She went into a 5 minute seizure while performing reaching and standing activities at 14.5 minutes.

[A.R. 100].

In September 2004, Dr. William Reid performed back surgery due to a diagnosis of "subligamentous disc herniation L4 left with L5 root compression." [A.R. 117]. Although Herin has continued to report some measure of back discomfort [A.R. 372], the administrative record does not document that she ever returned to Dr. Reid for further treatment.

Herin saw Dr. Salekin again on February 11, 2006. His diagnoses remained the same, with the exception that short-term memory was intact. Dr. Salekin noted some spinal tenderness and reduced sensation. Herin reported continuing episodes of tremors with impaired consciousness occurring five to six times per month. [A.R. 364]. Dr. Salekin completed both a "Questionnaire on Residual Functional Impairment - Physical Impairment" [A.R. 351-55] and a "Standard Form Medical Report for Industrial Injuries" [A.R. 371-75]. Collectively, these documents predict significant limitations which, if credited, would likely appear to preclude most, if not all, full-time employment.

On January 31, 2006, Herin received an administrative hearing regarding her application for Social Security disability benefits. On February 22, 2006, the Administrative Law Judge ("ALJ") issued a decision granting Herin's claim. [A.R. 194-202]. The ALJ concluded that Herin is disabled "as defined in the Social Security Act[.]" [A.R. 202]. The ALJ twice cited Herin's "credible hearing testimony and presentation" [A.R. 200] and concluded his opinion with the statement, "Due to her seizure disorder, the claimant should avoid driving." [A.R. 202].[4]

At Hartford's request, neurologist Pierson generated her first file review in May 2006. Dr. Pierson did not examine Herin but did partially discuss the medical record in her report. In material part, Dr. Pierson concluded,

---

[4] Herin's attorney contends that she "had a seizure" during the administrative hearing [A.R. 188], but there is nothing in the present record to document that assertion.

7

> . . . There is not enough data contained in the documentation to support [Dr. Salekin's] diagnosis of encephalopathy and there is no evidence to support that it has a toxic exposure etiology.
>
> Her episodes of jerking of total body were not accompanied by the usual clinical signs of seizure and in fact no epileptic etiology was identified when she had the event while hooked up to EEG[.] [S]he therefore has nonepileptic spells of another etiology, as yet unidentified. . . .
>
> . . .
>
> There is no objective evidence of an underlying pathologic condition which is related to work and therefore no evidence of an underlying disability related to a work related illness or condition.
>
> . . .
>
> There is no evidence contained in the records reviewed which would render the patient unable to work without restrictions.
>
> . . .
>
> The clients [sic] self reported symptoms and conditions are in no way supported by objective evidence of physical dysfunction as might be obtained through objective physical examination . . . diagnostic testing . . . and labs ....
>
> . . .
>
> The medical records do not indicate significant impairment.

[A.R. 342-44].

In Dr. Pierson's second file review, dated June 21, 2006, she again concluded that Dr. Salekin's diagnoses were objectively unsupported. [A.R. 348]. She also again acknowledged that Herin "has non-epileptic spells of another etiology, as yet unidentified." [A.R. 349]. Review of additional medical records did not alter Dr. Pierson's prior conclusion that "[t]here is no

8

evidence" that Herin is incapable of working without restriction. [A.R. 349-50].

*Herin*, 2008 WL 305004, at *2-4 (footnotes in original).

On remand, Herin provided Prudential with a small amount of additional medical documentation, most of which was already contained in the administrative record or was irrelevant. In the remaining documentation, it is noteworthy that Dr. Scott Gardner in August 2005 recorded no neurological or musculoskeletal complaints but instead observed depression, anxiety, and "concern over many social stressors." [S.R. 161]. The basis of Herin's appointment with Dr. Gardner was her complaints of chest pain during the previous month. Dr. Gardner "doubt[ed] cardiac etiology. I think this is probably due more to the anxiety overlay." [S.R. 161].

Dr. Bergia performed the IME in January 2009. Herin complained of jerking movements, headaches, intermittent back pain, numbness, itching, forgetfulness, and speech problems. [S.R. 88]. In reviewing the medical record, Dr. Bergia noted that the 2003 EEG taken during a purported seizure was normal. [S.R. 88]. Dr. Bergia investigated the 2002 bloodwork that led to Dr. Robinson's diagnosis of possible arsenic poisoning. Blount Memorial Hospital staff confirmed that the test results in fact did not exceed the "normal" range. [S.R. 89].

On examination, speech and memory appeared normal. [S.R. 90]. Dr. Bergia observed "[o]ccasional myoclonic jerking . . . in the arms and legs which went away with distraction." [S.R. 91].

Dr. Bergia found no evidence to support Herin's claims of cognitive impairment, radiculopathy, neuropathy, or "seizures" (as opposed to "jerking"). [S.R. 91-92]. Dr. Bergia concluded that: Herin's self-limitations appear overstated; no functional or vocational limitations were indicated; and "[t]he majority of the symptoms presented today appeared to be psychological in nature." [S.R. 92]. In response to Prudential's specific request for consideration of the Social Security Administration's ruling, Dr. Bergia wrote,

> That information does not alter my report findings. Specifically, the findings [of the ALJ were] that the medical evidence establishes that the claimant has the following severe impairments: Partial complex seizure disorder secondary to toxic solvent exposure is not true as she has not had any true documented epileptic seizures. In addition, the movement disorder, headaches with memory loss and confusion has not been documented as a true movement disorder secondary to any toxic solvent exposure. She has had restless leg syndrom which is easily treatable and had a normal memory examination. In regard to the history of a large disk herniation at the L4-5 level of the spine, status post laminectomy and diskectomy at the L4-5 level of the spine, she has had this surgically successfully treated and currently does not exhibit any evidence of residual radiculopathy symptoms. In regards to depression and anxiety, if she meets criteria for disability benefits based on psychopathology, I am not in a position to comment.

[S.R. 94].

IV.

*Analysis*

With regard to the application of the arbitrary and capricious standard, the Sixth Circuit has stated, "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F. 2d 689, 693 (6th Cir. 1989) (citation omitted). The arbitrary and

10

capricious standard "is the least demanding form of judicial review of administrative action." *Id.* In its review of the denial of benefits, this court does not substitute its judgment for that of the administrator. *See Brown v. Nat'l City Corp.*, 974 F. Supp. 1037, 1041 (W.D. Ky. 1997) (citing *Caterino v. Barry*, 8 F.3d 878, 883 (1st Cir. 1993)).

Decisions concerning eligibility for ERISA benefits are not arbitrary and capricious if they are "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Marchetti v. Sun Life Assurance Co. of Can.*, 30 F. Supp. 2d 1001, 1008 (M.D. Tenn. 1998) (citing *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir. 1996)).

In arguing that the latest denial of her claim was arbitrary and capricious, Herin criticizes Prudential's reliance on Dr. Bergia. Herin, through her attorney, argues that Dr. Bergia's conclusions should be viewed with skepticism because her examination was paid for by Prudential. To suggest in the present case that a doctor's opinion should be disregarded due to her association with a party appears disingenuous. Herin's favored source of evidence is Dr. Salekin, and it was Herin's attorney who referred her to that doctor for each of her four visits. [A.R. 371]. The court has not disregarded Dr. Salekin's evidence merely due to his association with plaintiff's counsel, and the court similarly will not disregard Dr. Bergia's report merely because her examination was paid for by Prudential.

11

Ultimately, Herin's briefing characterizes Dr. Bergia's evaluation as cursory ("at best a short office visit").  Having reviewed Dr. Bergia's evaluation, along with the lengthy instructions provided to her by Prudential [S.R. 74-77], the court disagrees.  Dr. Bergia's personal examination was more than sufficient on the facts of this particular case.  In addition, Dr. Bergia researched and illuminated the objective testing of record.  Her conclusions were consistent with those of other medical sources.  To the extent that her conclusions differed from those of Drs. Salekin and Robinson, she explained why.

Dr. Bergia ultimately opined that Herin's jerking symptoms are most likely psychologically-based.  It was not arbitrary or capricious for Prudential to rely on that conclusion. Herin told Dr. Fang that her symptoms began shortly after the anniversary of her father's death, which had "caused her to feel quite depressed." [A.R. 324].  She told Dr. Bergia that her jerking worsens when she is excited or nervous [S.R. 88], and she made the same statement to Dr. Robinson. [S.R. 157].  By 2004, Dr. Robinson's notes made little mention of Herin's "possibly solvent-induced seizure disorder" other than twice describing the condition as "stable" [A.R. 131, 134], but regular mention is made of her "generalized anxiety disorder."  [A.R. 131, 134, 306, 308].  In 2005, Dr. Gardner deemed plaintiff's cardiac complaints also to be most likely related to anxiety.  Of note, Herin disclosed to Dr. Bergia that Drs. Radoff and Paulson also thought her jerking disorder was "mental in nature" rather than neurological [S.R. 87], yet neither of those physicians' records appear to have been provided to Prudential.  Lastly, although Dr. Bergia did observe some jerking motions

12

during her examination, they "went away with distraction." [S.R. 91]. There was thus ample support for Prudential's reliance on Dr. Bergia and the Plan's mental illness exclusion.

As discussed in the court's prior opinion, Dr. Salekin's diagnosis is minimally supported by objective data, and his visits with Herin were sporadic. As also noted in the court's prior opinion, meaningful portions of Dr. Robinson's file remain unavailable for review. It is further noteworthy that Herin still apparently has not provided her purported videotape to neurologist Fang as requested.

To the extent that Herin would continue to rely on her alleged back pain, the record still documents no follow-up treatment from her surgeon or any other source, even though Herin has Medicare insurance. [S.R. 99]. Further, it is again noted that physical therapist Johnson's highly limiting functional capacity assessment predates Herin's surgery.

As it must, the court has reviewed Prudential's consideration of the Social Security Administration's finding of disability. Prudential asked Dr. Bergia to review the ALJ's opinion. Dr. Bergia explained point by point her disagreement with the ALJ's conclusions, and Prudential adopted that reasoning in its 2009 denial letter. It is further noteworthy that Herin was found disabled by the Social Security Administration in part due to the severe impairments of depression and anxiety [A.R. 201], which as noted are not grounds for long term disability under the Plan.[5]

---

[5] It is also striking that the ALJ deemed Herin incapable of driving, yet she told Dr. Bergia that she can drive continuously for 30 minutes. [S.R. 90].

13

# V.

## *Conclusion*

Despite Herin's subjective complaints, the court cannot say that Prudential's termination of LTD benefits was irrational, unfounded, or without reasoned explanation. In reaching its conclusion, the court has considered: (1) the SSA's determination that Herin is disabled, which, "though certainly not binding, is far from meaningless," *Calvert v. Firstar Finance*, 409 F.3d 286, 294 (6th Cir. 2005); and (2) Prudential's inherent conflict of interest in its dual roles of plan administrator and claim payor. *See id*. at 292-93. Nonetheless, under the circumstances of this case and the administrative record as discussed above, the court cannot say that it was unreasonable or irrational for Prudential to conclude that Herin is not disabled as that concept is defined by the Plan.

Accordingly, the court will affirm Prudential's termination of LTD benefits. An order reflecting this opinion will be entered.

ENTER:

                                                    s/ Leon Jordan
                                                   United States District Judge